**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

**NICHOLAS SHAFER,**

    **Plaintiff,**

**CIVIL ACTION NO. 3:25-CV-3566**

**v.**

**CLOUDBEES, INC.**

    **Defendant.**

_____/

**PLAINTIFF'S SECOND AMENDED COMPLAINT**

COMES NOW, Plaintiff, Nicholas Shafer, who hereby files his Second Amended Complaint against CloudBees, Inc., and would show unto the Court as follows:

### A. PARTIES

1. Plaintiff, Nicholas Shafer ("Plaintiff" or "Shafer"), is an individual residing in Dallas County, Texas

2. Defendant CloudBees, Inc. ("Defendant" or "CloudBees") is upon information and/or belief a Delaware corporation having its principal place of business at 125 S. Market St., Suite 400, San Jose, California 95113. No further service is necessary at this time.

### B. JURISDICTION AND VENUE

2. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

3. Plaintiff Nicholas Schafer is a citizen of the State of Texas. Defendant CloudBees, Inc. is a corporation incorporated under the laws of Delaware with its

1

principal place of business in Neuchâtel, Switzerland. Accordingly, Defendant is a citizen of Delaware and is not a citizen of Texas.

4.      The amount in controversy exceeds $75,000, exclusive of interest and costs, as Plaintiff seeks recovery of unpaid compensation and other damages arising from Defendant's alleged conduct.

5.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

6.      Venue is also proper because this action was removed from the 68th Judicial District Court of Dallas County, Texas, which lies within the Northern District of Texas, Dallas Division. See 28 U.S.C. §§ 1441(a) and 1446(a).

**C.      FACTS**

7.      On or about July, 2023, Plaintiff Nicholas Schafer was recruited by Defendant CloudBees to pursue potential employment as a Sales Representative/Account Executive.

8.      CloudBees provided Shafer with an electronic Employee Handbook and Compensation Program.

9.      CloudBees standard offer for new sales hires is a 3-month, non-recoverable draw to smooth the transition and mimic commission compensation.

10.      CloudBees made a non-standard offer to Shafer by taking the standard three-month non-recoverable draw and spreading it over a six-month period. At the time Schafer accepted this non-standard structure, it was not clear to him how the change would affect his compensation; however, he agreed to the structure because his hiring

2

manager represented that it was in his best interests and stated that she had requested a similar payment plan when she was hired.

11.  During the interview process, the non-recoverable draw was described to Shafer as a guarantee. However, CloudBees did not disclose that accepting the six-month draw structure would extend the clawback period, such that draw payments would be deducted from Schafer's earned commissions. Based on these representations and omissions, Schafer believed he was agreeing to a guaranteed draw coupled with a management-suggested payment schedule.

12.  While interviewing, Schafer was also told by his hiring manager that his onboarding plan would involve working on a new 7-Eleven (Southland Corp.) deal with his peer mentor, and that he would share credit and commissions for that deal if it closed.

13.  No one involved in the hiring process advised Shafer that selecting the six-month draw structure created a risk that he would be unable to earn commissions on anticipated onboarding deals, including the 7-Eleven transaction. Shafer was not informed that the extended clawback period associated with the non-standard draw could materially reduce or eliminate his commissions on such deals.

14.  Had CloudBees disclosed how the six-month draw structure and extended clawback period would operate in practice, Schafer alleges that a standard non-recoverable draw structure could have been offered in connection with the onboarding deal anticipated to close in December or January. Under that structure, Schafer would have been positioned to earn commissions on early onboarding deals as a new hire. Instead, CloudBees proceeded with the non-standard draw structure without disclosing the associated clawback consequences. These representations and omissions were

material to Schafer's decision to accept CloudBees' offer of employment and the non-standard six-month draw structure.

15.     Shafer accepted the terms of his employment Offer from CloudBees and signed and returned the sales commission agreement and/or employee handbook, and became an employee of CloudBees.

16.     While employed with CloudBees (August 2023 to February 7, 2024), Shafer successfully closed three (3) deals that are the basis for his claims herein for which he earned compensation in accordance with the compensation agreement.

***FIRST DEAL:      Dell 1.0***

17.     CloudBees allows users to renew their software licenses at a lower rate versus purchasing new software licenses.  The lower rate is referred to as a *downsell* whereas new business licenses are referred to as new business (hereinafter "*new business*").

18.     The Dell Computer account (hereafter "Dell") (a previous purchaser of the CloudBees software) was due to renew their software in December of 2023.  They chose to renew lower quantities of licensed software and closed the transaction in November 2023 via a downsell (at a reduced commission).  This purchase is not at issue.

19.     On or about December 2023, Shafer was successful in selling Dell additional new software licenses (not included in the downsell in November of 2023).  The amount of the sale was $52,000.00.  Shafer was told by both his manager Ms. Arguelles and his team's assigned sales operations manager, Taylor Seus, that the Dell purchase would be considered *new business* because "once a renewal closes, it is done and not re-opened."

20.     Deals cannot show as *new business* in Salesforce (CloudBees Customer Relationship Management (CRM) software) without approval by both management and

4

sales operations.  As of March 2024, Shafer's manager still classified this deal as *new business.*

### SECOND DEAL:    *7-Eleven/Southland Corporation*

21.    When the 7-Eleven/Southland Corporation (hereinafter "7-Eleven") deal was created, the deal was slated for a December 2023 close (the deal ended up closing in January 2024).

22.    From the time Shafer started at CloudBees in August 2023, he collaborated on a large deal with 7-Eleven in conjunction with his onboarding mentor.  The work involved in this deal included multiple weekly meetings and check-ins, working with the customer on NDA, security review, MSA negotiation with legal department, quoting options, etc.

23.    The deal was originally slated to close in December 2023, but didn't close until the very last day of the CloudBees fiscal year (January 31, 2024).  The day the deal closed, Shafer and his onboarding mentor received public congratulations from their team.

24.    As the 7-Eleven deal was coming to a close in January 2024, Shafer's onboarding mentor Matt shared that he didn't think it was fair that the extended draw period would keep Shafer from getting paid on the deal (see Paragraphs 10-12 herein).

25.    This is when Shafer learned he didn't just agree to a non-standard payment plan for his guarantee, but that non-standard option created by his hiring manager extended a clawback period that allowed for a draw carve.  Matt suggested that Shafer reach out to the compensation committee and ask for an exception.

26.    In a bizarre turn of events, Shafer was notified by his hiring manager, Graciela Arguelles, on or about February 6, 2024, that the 7-Eleven deal (which at this

5

time was already completed and documented) was being taken away from him.  Shafer would receive no quota credit, no payment/commission even though the deal was worked on for months, closed successfully, money changed hands, and CloudBees made its profit.

### THIRD DEAL:  Dell 2.0

27.    On or about February, 2024, Shafer was once again successful in closing roughly $235,000.00 of new software licenses in a second sale to Dell.  Shafer was again told by both his manager Ms. Arguelles and his team's assigned sales operations manager, Taylor Seus, that this second Dell purchase would count as *new business.*

28.    Taylor confirmed this purchase as *new business* in a conversation with Shafer and his Sales Engineer Chris Wroble at the CloudBees Sales Kick-off Meeting in Las Vegas in February of 2024.  Once again, Salesforce showed this opportunity in the system as *new business* —which again, does not show that way without management and sales operations approval.

29.    Much to his shock and dismay, on or about February 7, 2024, after CloudBees had already accepted funds from Dell for both of the purchases of *new business* software licenses, Shafer was told by his manager Ms. Arguelles that both new sales would only be paid at the downsell commission rate (even though CloudBees did not give Dell *downsell* pricing on the these two purchases of software licenses).

30.    After Shafer raised his concern over the way the three sales were being taken back by CloudBees (and not paid per the compensation agreement), Shafer who had to this point only received excellent reviews, received a letter in his file by Ms. Arguelles fabricating reasons to all of a sudden claim that Shafer was not up to snuff and had to improve or be terminated.  Quite demonstratively, when CloudBees believed Shafer had sold almost 115 percent of his yearly sales quota, he was congratulated by all.  It's only

6

when Shafer started to inquire about his compensation for said sales did he immediately receive this phony evaluation in an effort by ClouldBee to try and cover up its acts and/or omissions.

31.    At this point, it became abundantly clear to Shafer that (1) he was taken in by CloudBees fraudulent inducement and/or detrimental reliance to accept position with CloudBees, (2) CloudBees was not going to pay him the compensation per the compensation agreement, and (3) CloudBees was trying to get him to resign by creating such a hostile work environment that Shafer would elect to quit.

32.    The hostile work environment by CloudBees (in an attempted to keep its ill-gotten gains from Shafer's labor and/or successful sales) were displayed by the following (but not limited to) events in an effort to get Shafer to resign:

(i)    Gross managerial incompetence on multiple fronts (consistently confused about processes and compensation, conducted no performance reviews, purposely kept accounts (and pipeline) out of Shafer's sales territory, claimed to have no idea how Shafer was running his business after 7 months while simultaneously claiming poor performance, etc.);

(ii)    Use of threatening language by a superior directed at a subordinate;

(iii)    Theft/Conversion of sales deals in direct breach of contract;

(iv)    Ostracized at company meeting by both manager and onboarding mentor;

(v)    Fabricated poor performance with zero supporting documentation;

(vi)    Weaponized PIP letter with a laundry list of milestones to be achieved in a completely unachievable time frame; and;

(vii)    Expectation to present an inaccurate representation of Shafer's performance at Quarterly Business Review ("QBR") (meeting of many people on a zoom call) by both CloudBees management and Human Resources.  Shafer had already achieved 4th quarter ("Q4") sales at 95 percent of his sales quota and with the 1st quarter 2024 Dell deal, he would have sold 117 percent of his sales quota.  By thereafter, stripping him of his already closed sales, CloudBees planned to publicly humiliate Shafer at the QBR by making him announce and/or agree that he had only achieved 20 percent in Q4 and nothing at all in Q1, 2024.

33.    Due to this hostile work environment, Shafer was forced to take his first "mental health day" of his career (over 20 plus years), in order to avoid the March QBR public belittlement and/or shaming by CloudBees.

34.    Moreover, these purposeful acts and/or omissions by CloudBees also caused Shafer to experience the first panic attack of his life, and he had to go to the ER for treatment.

35.    Shafer also turned to the Better Help counseling included in the benefits package to help deal with the stress of this situation.

36.    Within 10 days of the planned deprecation planned for Shafer at the CloudBees QBR, Shafer was wrongfully terminated.

### D.    CAUSES OF ACTION

### COUNT I: BREACH OF CONTRACT

37.    Plaintiff Schafer repleads and incorporates by reference Paragraphs 1–37, above, as if fully set forth herein.

A.  Existence of Valid Contracts

38.    Plaintiff Schafer and Defendant CloudBees entered into valid and enforceable written agreements governing Schafer's compensation, including (i) CloudBees' July 25, 2023 Offer Letter and (ii) the CloudBees FY24 Sales Incentive Compensation Policy and related Compensation Plan (collectively, the "Agreements").

39.    The Agreements set forth the terms under which Schafer was entitled to receive base salary, non-recoverable draw payments, and incentive compensation, including commissions earned on qualifying sales transactions.

B.  Schafer's Performance

40.    Schafer performed his obligations under the Agreements by accepting CloudBees' offer of employment, performing his duties as an Account Executive, pursuing and closing sales opportunities, and otherwise complying with the requirements of the applicable compensation policies.

C.    CloudBees' Breaches

1. Failure to Pay Earned Incentive Compensation

41.    The Agreements require CloudBees to pay incentive compensation that is earned and unpaid, including upon termination of employment for any reason.

42.    During his employment, Schafer successfully closed multiple qualifying sales transactions that satisfied the contractual requirements for earning incentive compensation under the FY24 Sales Incentive Compensation Policy, including satisfaction of the booking and performance criteria set forth therein.

43.    Despite Schafer's performance and the earning of such incentive compensation, CloudBees failed and refused to pay Schafer commissions and other incentive compensation that were earned and owed under the Agreements.

2. Breach of Non-Recoverable Draw Obligations

44.    The Offer Letter expressly provided that Schafer would receive a non-recoverable draw against commissions during the initial period of his employment, and that such draw was not subject to repayment or clawback if commissions ultimately fell short.

45.    Contrary to these express contractual terms, CloudBees improperly offset, withheld, or otherwise deprived Schafer of the full benefit of the non-recoverable draw promised in the Offer Letter.

3. Failure to Comply with Termination-Related Payment Obligations

9

46.     The FY24 Sales Incentive Compensation Policy further provides that, upon termination of employment for any reason, CloudBees must pay all incentive compensation that was earned and unpaid as of the termination date.

47.     Schafer's employment with CloudBees ended in February 2024 after CloudBees implemented changes to Schafer's compensation structure and sales assignments that materially undermined his ability to receive compensation promised under the Agreements and rendered continued employment untenable.

48.     Regardless of the circumstances of Schafer's separation, the Agreements required CloudBees to timely pay all earned incentive compensation owed to Schafer as of his termination date.

49.     CloudBees breached the Agreements by failing to do so.

D.  Damages

As a direct and proximate result of CloudBees' breaches, Schafer has suffered damages including, but not limited to, unpaid commissions, unpaid incentive compensation, unpaid draw amounts, interest, attorneys' fees, and costs as permitted by law

50.     All conditions precedent have been performed by Nicholas Schafer and/or the below signed counsel.

51.     Due to Defendant's purposeful acts and/or omission, Shafer was required to obtain legal counsel.   Plaintiff's offer to settle was tendered to Defendant well over 30 days ago.

52.     In accordance with Tex. Civ. Prac. & Rem. Code § 38.001, Plaintiff seeks the usual, customary and reasonable attorney fees expended to pursue Plaintiff's claims.  A

systematic record of all time expended, the rate applied ($750.00 per hour), and work performed shall be tendered to the trial court Judge for consideration.

<strong>COUNT II:  PROMISSORY ESTOPPEL</strong>

53. Plaintiff Schafer repleads and incorporates by reference Paragraphs 1–37, above, as if fully set forth herein.

54. During the recruiting process and after Schafer began his employment, CloudBees, through its hiring manager and other management and sales-operations personnel, made specific promises and representations to Schafer concerning his compensation and the manner in which his sales efforts and closed deals would be credited and paid.

55. These promises included, without limitation, representations that:

a. the non-recoverable draw offered to Schafer functioned as a guaranteed form of compensation and would not operate to deprive him of earned commissions;

b. acceptance of a six-month draw structure would not materially impair Schafer's ability to earn commissions on deals he successfully closed;

c. Schafer would receive shared credit and commissions for work performed on the 7-Eleven onboarding deal; and

d. specific transactions Schafer worked on and closed, including the Dell and 7-Eleven deals, would be treated as "new business" and credited and paid accordingly.

56. These promises and representations were made outside the express terms of the written employment and compensation agreements and concerned CloudBees'

intended application of discretionary compensation rules and deal classification practices.

57.    CloudBees made these promises with the intent, or at least the reasonable expectation, that Schafer would rely on them by accepting CloudBees' offer of employment, agreeing to a non-standard compensation structure, continuing his employment, and devoting substantial time and effort to closing sales opportunities on CloudBees' behalf.

58.    Schafer reasonably and foreseeably relied on these promises by accepting CloudBees' offer of employment, agreeing to the six-month draw structure, continuing to perform his duties, and successfully closing multiple sales transactions in reliance on CloudBees' assurances regarding compensation and deal credit.

59.    Schafer's reliance was substantial and detrimental. After Schafer relied on CloudBees' promises and closed the relevant deals, CloudBees reclassified, removed, or otherwise denied commission and quota credit for those transactions, resulting in Schafer's loss of compensation he reasonably expected to receive.

60.    Injustice can be avoided only by enforcement of CloudBees' promises or by awarding Schafer reliance damages sufficient to compensate him for the losses he incurred as a result of his reasonable reliance.

61.    Accordingly, in the alternative to his breach of contract claim, Schafer seeks recovery under the doctrine of promissory estoppel for damages proximately caused by his detrimental reliance on CloudBees' promises.

### COUNT III: FRAUDULENT INDUCEMENT

62.    Plaintiff Schafer repleads and incorporates by reference Paragraphs 1–37, above, as if fully set forth herein.

12

63. During the recruiting process, CloudBees made material misrepresentations and misleading partial disclosures regarding the nature of the non-recoverable draw, the effect of the six-month draw structure on commission clawbacks, and Schafer's ability to earn commissions on anticipated onboarding deals.

64. CloudBees made these statements and omissions with the intent that Schafer rely on them in deciding whether to enter into the employment agreement. These representations and omissions were made for the purpose of inducing Schafer to accept CloudBees' offer of employment and the non-standard compensation structure.

65. Schafer actually and justifiably relied on these statements and omissions by accepting CloudBees' offer of employment and agreeing to the six-month draw structure, which he would not have done had the true operation of the draw and clawback been disclosed.

66. As a direct result of his reliance on CloudBees' misrepresentations and omissions, Schafer suffered financial losses arising from his entry into the employment agreement under the fraudulently induced compensation structure.

### E.   CONDITIONS PRECEDENT

67. All conditions precedent to Plaintiff's claims for relief have been performed or have occurred.  Counsel provided notice to Defendant, including but not limited to, Plaintiff's claim for attorneys fees.  Defendant had no intention of settlement.  Plaintiff thereafter filed his claim and paid for fees via JAMS, per the contractual terms of his Employment Agreement with Defendant.  However, Defendant failed to make payment to JAMS after repeated requests, and finally, JAMS closed out the case for Defendant's failure to follow its protocol.  Thus, having exhausted any administrative remedies prior to the filing of said suit, Shafer filed his Original Petition in a court of jurisdiction in Dallas

County, Texas, which was removed to this Court so Shafer now files this Second Amended Complaint.

## F.    DAMAGES

68.    As a direct and proximate result of Defendant's acts and/or omissions, Shafer has sustained financial losses and incurred expenses.

69.    Shafer has also suffered mental damages due to the direct and proximate result of Defendant's acts and/or omissions.

70.    Shafer also had to hire the undersigned counsel of record at his usual, customary and reasonable rate of $750.00 hourly.

## G.    PRAYER FOR RELIEF AND DEMAND FOR TRIAL BY JURY

WHEREFORE, Plaintiff requests that Defendant appear and answer, and that this case be tried before a jury, after which the Court declare CloudBees liable for damages including but not limited to, the following:

(1)    Actual damages;

(2)    Mental pain and suffering;

(3)    Costs of court;

(4)    prejudgment and post-judgment interest at the highest lawful rate;

(5)    Reasonable attorneys' fees, and

(6)    such other and further relief, at law or in equity, to which Plaintiff is justly entitled.

Dated: June 3, 2026.

14

Respectfully submitted,

BRUCE C. KAYE, PLLC

/s/ Bruce C. Kaye
Bruce C. Kaye
State Bar No. 00784374
Heritage One
4835 LBJ Expressway, Suite 470
Dallas, Texas 75201
Phone: (214) 722-7438
Email: bruce@brucekaye.com

ATTORNEY FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on June 3, 2026, the foregoing Plaintiff's Second Amended Complaint filed electronically through the Court's CM/ECF system, which will serve notice of such filing on all counsel of record.

/s/ Bruce C. Kaye
Bruce C. Kaye

15