**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

**NICHOLAS SHAFER,**

**Plaintiff,** **CIVIL ACTION NO. 3:25-CV-3566**

**v.**

**CLOUDBEES, INC.**

**Defendant.**
______________________________/

## PLAINTIFF'S THRID AMENDED COMPLAINT and JURY DEMAND

COMES NOW, Plaintiff, Nicholas Shafer, who hereby files his Third Amended Complaint against CloudBees, Inc., and would show unto the Court as follows:

## A. PARTIES

1. Plaintiff, Nicholas Shafer ("Plaintiff" or "Shafer"), is an individual residing in Dallas County, Texas

2. Defendant CloudBees, Inc. ("Defendant" or "CloudBees") is upon information and/or belief a Delaware corporation having its principal place of business at 125 S. Market St., Suite 400, San Jose, California 95113. No further service is necessary at this time.

## B. JURISDICTION AND VENUE

2. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

3. Plaintiff Nicholas Schafer is a citizen of the State of Texas. Defendant CloudBees, Inc. is a corporation incorporated under the laws of Delaware with its

principal place of business in Neuchâtel, Switzerland. Accordingly, Defendant is a citizen of Delaware and is not a citizen of Texas.

4. The amount in controversy exceeds $75,000, exclusive of interest and costs, as Plaintiff seeks recovery of unpaid compensation and other damages arising from Defendant's alleged conduct.

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

6. Venue is also proper because this action was removed from the 68th Judicial District Court of Dallas County, Texas, which lies within the Northern District of Texas, Dallas Division. See 28 U.S.C. §§ 1441(a) and 1446(a).

**C. FACTS**

7. Plaintiff Nicholas Schafer was recruited by Defendant CloudBees to pursue potential employment as a Sales Representative/Account Executive.

8. CloudBees provided Shafer with an electronic Employee Handbook and Compensation Program, attached hereto as Plaintiff's Exhibit "A."

9. A series of emails exchanged on July 25, 2023, point out the following:

- On July 25, 2023, immediately before the written employment offer was finalized, CloudBees recruiter Johanna Tuttle informed Nick that the compensation budget was $145,000 base/ $145,000.00 variable, for a total of $280,000.00.00 OTE, and that CloudBees could offer either:
- Three months at 100 percent draw; or
- Six months at 50 percent draw.

- Nick had proposed a six-month draw at 75%. Jo responded that CloudBees could offer either three months at 100% or six months at 50%, but not six months at 75%. Nick responded that because he did not know what the existing 2023 pipeline looked like and because of the lengthy sales cycles at CloudBees, he preferred the six-month option. In that same email, however, Nick specifically asked:
    - "If a quota is being assigned, will I earn commissions (in addition to the draw) on deals/renewals that close?"

He also asked whether he would immediately inherit and work deals already in the pipeline. See *Plaintiff's Exhibit B,* attached hereto, the email chain between Nick and Johanna Tuttle, Senior Talent Acquisition Partner, CloudBees, Inc., which documents the matter.

12. On the same date, Graciela Arguelles sent Nick an example compensation plan reflecting:

- $1,000,000 New/Expansion ARR quota;
- 14.5% New/Expansion ARR rate;
- 1% Renewals ARR rate;
- 4% prepaid multiyear rate;
- 2.5% non-prepaid multiyear rate; and
- additional New ARR acceleration above quota.

Graciela then asked whether Nick had time for a conference call that day so she could answer his questions. *See Plaintiff's Exhibit C,* attached hereto, email chain regarding the compensation plan example to Nick from Graciela Arguelles, Sr. Director of Sales, Central CloudBees, Inc.

13. Nick recalls a one-on-one "Google Meet" with Graciela on July 25, 2023, approximately 4:50 p.m. to 5:20 p.m. Central Time. Graciela described the three-month/100% arrangement as the standard draw and personally proposed and recommended that Nick instead select the non-standard six-month/50% draw.

14. Graciela explained that although Nick's title would be Strategic Account Executive, the assigned account set was not equivalent to the type of established strategic territory that a conventional senior strategic seller might expect. The territory had existing challenges that needed to be addressed. Nick recalls Graciela explaining that part of her interest in him was that he was somewhat more junior and “hungrier” than a traditional strategic-account seller and therefore more likely to take on the work of repairing the territory while pursuing longer-cycle enterprise growth and new-logo opportunities.

15. According to Nick's recollection, Graciela explained that when she joined CloudBees she had been tasked with building a team from scratch and therefore had required a longer-than-normal ramp. She compared that situation directly to what Nick would face. Nick understood the six-month structure to be a ramp benefit recommended because of the particular sales environment he was inheriting.

16. Nick relied (detrimentally) on Graciela’s recommendation because she was his prospective manager and possessed superior knowledge concerning the actual territory, existing pipeline, account assignments, and anticipated ramp.

17. After verbally accepting the offer, Nick received his formal Offer Letter. See *Plaintiff’s Exhibit “D”*, attached hereto.

18. During the interview process, the non-recoverable draw was described to Shafer as a guarantee. However, CloudBees did not disclose that accepting the six-month draw structure would extend the clawback period, such that draw payments would be deducted from Schafer’s earned commissions. Based on these representations and omissions, Schafer believed he was agreeing to a guaranteed draw coupled with a management-suggested payment schedule.

19. While interviewing, Schafer was also told by his hiring manager that his onboarding plan would involve working on a new 7-Eleven (Southland Corp.) deal with his peer mentor, and that he would share credit and commissions for that deal if it closed.

20. Nick's recollection is that the developing 7-Eleven opportunity was part of the same July 25, 2024, compensation and ramp discussion in which Graciela recommended the six-month draw. According to Nick,

- Graciela wanted to move quickly with the hire because a significant 7-Eleven opportunity was developing;
- Nick would work the opportunity with veteran Account Executive Matt Herman, who would also serve as Nick's onboarding mentor;
- the transaction would be a 50/50 split between Nick and Matt for compensation and credit;
- Matt would take the primary role because of his CloudBees knowledge and experience;
- Nick would participate throughout the transaction and learn CloudBees' complete end-to-end sales process directly from an experienced seller; and
- the opportunity was presented as both an onboarding experience and an opportunity for Nick to contribute to and receive credit for a meaningful enterprise transaction.

21. Nick does not characterize the opportunity as a "shadow deal." His recollection is that it was a shared opportunity in which his coworker Matt (mentor) would lead, but Nick would actively participate.

22. Nick recalls that the 7-Eleven opportunity affected his assessment of the CloudBees offer because it meant that, despite the challenges Graciela had described in the assigned territory, he would begin with an active enterprise transaction, direct one-on-one mentorship from a veteran Account Executive, and anticipated shared compensation and production credit. The opportunity was an incentive really to counterbalance the acknowledged challenges associated with the territory Nick would inherit.

23. No one involved in the hiring process advised Shafer that selecting the six-month draw structure created a risk that he would be unable to earn commissions on anticipated onboarding deals, including the 7-Eleven transaction. Shafer was not informed that the extended clawback period associated with the non-standard draw could materially reduce or eliminate his commissions on such deals.

24. Had CloudBees disclosed how the six-month draw structure and extended clawback period would operate in practice, Schafer alleges that a standard non-recoverable draw structure could have been offered in connection with the onboarding deal anticipated to close in December or January. Under that structure, Schafer would have been positioned to earn commissions on early onboarding deals as a new hire. Instead, CloudBees proceeded with the non-standard draw structure without disclosing the associated clawback consequences. These representations and omissions were material to Schafer's decision to accept CloudBees' offer of employment and the non-standard six-month draw structure.

25. Shafer accepted the terms of his employment Offer from CloudBees and signed and returned the sales commission agreement and/or employee handbook, and became an employee of CloudBees, *See Plaintiff's Exhibit "A", attached hereto*.

26. While employed with CloudBees (August 2023 to February 7, 2024), Shafer successfully closed three (3) deals that are the basis for his claims herein for which he earned compensation in accordance with the compensation agreement.

***FIRST DEAL: Dell 1.0***

27. CloudBees allows users to renew their software licenses at a lower rate versus purchasing new software licenses. The lower rate is referred to as a *downsell* whereas new business licenses are referred to as new business (hereinafter "*new business*").

28. The Dell Computer account (hereafter "Dell") (a previous purchaser of the CloudBees software) was due to renew their software in December of 2023. They chose to renew lower quantities of licensed software and closed the transaction in November 2023 via a downsell (at a reduced commission). This purchase is not at issue.

29. On or about December 2023, Shafer was successful in selling Dell additional new software licenses (not included in the downsell in November of 2023). The amount of the sale was $52,000.00. Shafer was told by both his manager Ms. Arguelles <u>and</u> his team's assigned sales operations manager, Taylor Seus, that the Dell purchase would be considered *new business* because "once a renewal closes, it is done and not re-opened."

30. Deals cannot show as *new business* in Salesforce (CloudBees Customer Relationship Management (CRM) software) without approval by both management and sales operations. As of March 2024, Shafer's manager still classified this deal as *new business*.

***SECOND DEAL: 7-Eleven/Southland Corporation***

31. When the 7-Eleven/Southland Corporation (hereinafter "7-Eleven") deal was created, the deal was slated for a December 2023 close (the deal ended up closing in January 2024).

32. From the time Shafer started at CloudBees in August 2023, he collaborated on a large deal with 7-Eleven in conjunction with his onboarding mentor. The work involved in this deal included multiple weekly meetings and check-ins, working with the customer on NDA, security review, MSA negotiation with legal department, quoting options, etc.

33. The deal was originally slated to close in December 2023, but didn't close until the very last day of the CloudBees fiscal year (January 31, 2024). The day the deal closed, Shafer and his onboarding mentor received public congratulations from their team.

34. As the 7-Eleven deal was coming to a close in January 2024, Shafer's onboarding mentor Matt shared that he didn't think it was fair that the extended draw period would keep Shafer from getting paid on the deal, *supra*.

35. This is when Shafer learned he didn't just agree to a non-standard payment plan for his guarantee, but that non-standard option created by his hiring manager extended a clawback period that allowed for a draw carve. Matt suggested that Shafer reach out to the compensation committee and ask for an exception.

36. In a bizarre turn of events, Shafer was notified by his hiring manager, Graciela Arguelles, on or about February 6, 2024, that the 7-Eleven deal (which at this time was already completed and documented) was being taken away from him. Shafer would receive no quota credit, no payment/commission even though the deal was worked on for months, closed successfully, money changed hands, and CloudBees made its profit.

37. Nick recalls Graciela taking the position that she was removing his credit and giving the transaction fully to Matt because Nick "didn't do enough to help" on the deal.

***THIRD DEAL: Dell 2.0***

38. On or about February, 2024, Shafer was once again successful in closing roughly $235,000.00 of new software licenses in a second sale to Dell. Shafer was again told by both his manager Ms. Arguelles and his team's assigned sales operations manager, Taylor Seus, that this second Dell purchase would count as *new business*.

39. Taylor confirmed this purchase as *new business* in a conversation with Shafer and his Sales Engineer Chris Wroble at the CloudBees Sales Kick-off Meeting in Las Vegas in February of 2024. Once again, Salesforce showed this opportunity in the system as *new business* —which again, does not show that way without management and sales operations approval.

40. In anticipation of the deal, Nick sent an email trying to get clarification on his anticipated compensation. See *Plaintiff's Exhibit "E"*, attached hererto.

41. Much to his shock and dismay, on or about February 7, 2024, after CloudBees had already accepted funds from Dell for both of the purchases of *new business* software licenses, Shafer was told by his manager Ms. Arguelles that both new sales would only be paid at the downsell commission rate (even though CloudBees did not give Dell *downsell* pricing on the these two purchases of software licenses).

42. Upon learning this news, Nick had a one-on-one meeting with Graciela, whereby he voiced his concerns. As referenced in Nick's Retaliation Notes for HR Investigation, *See Plaintiff's Exhibit "F",* attached hereto, Graciela told him, "nobody held a gun to your head to choose that option."

43. Additionally, the Note for HR also states (regarding the February 2024 Dell transaction):

- Graciela initially conveyed incorrect information concerning whether Nick would be paid if the deal term was less than one year;
- Sales Operations corrected that information; and
- Graciela and Taylor Seus told Nick that he would retire quota and earn commission before the transaction was later classified in a manner that removed the disputed credit.

44. Hence, while still employed, Nick specifically recorded his position that both Graciela and Taylor had told him he would retire quota and earn commission on the transaction before the disputed later treatment.

45. After Shafer raised his concern over the way the three sales were being taken back by CloudBees (and not paid per the compensation agreement), Shafer who had to this point only received excellent reviews, received a letter in his file by Ms. Arguelles fabricating reasons to all of a sudden claim that Shafer was not up to snuff and had to improve or be terminated. Quite demonstratively, when CloudBees believed Shafer had sold almost 115 percent of his yearly sales quota, he was congratulated by all. It's only when Shafer started to inquire about his compensation for said sales did he immediately receive this phony evaluation in an effort by ClouldBee to try and cover up its acts and/or omissions.

46. Nick raised this point in his "Notes for HR Retaliation Investigation" (the current HR notes corroborate his dissatisfaction with his participation had been communicated before February 6, 2024.

47. At this point, it became abundantly clear to Shafer that (1) he was taken in by CloudBees fraudulent inducement and/or detrimental reliance to accept position with CloudBees, (2) CloudBees was not going to pay him the compensation per the compensation agreement, and (3) CloudBees was trying to get him to resign by creating such a hostile work environment that Shafer would elect to quit.

48. While still employed, Nick provided CloudBees HR with his "Notes for HR Retaliation Investigation" which stated:

- he had planned to accept the standard three-month sales draw until Graciela suggested the six-month draw;
- Graciela discussed her own hiring experience and directly compared her experience building a team with Nick's situation building a troubled territory;
- Nick chose the six-month option because Graciela suggested it and was in the best position to know what accounts and pipeline would be assigned to him; and
- Nick would not have known about the non-standard six-month option had Graciela not introduced it. *See Plaiintiff's Exhibit" F,"* attached hereto, entitled Notes for HR Retaliation Investigation.

49. The same Notes for HR Retaliation Investigation state that:

- it had been communicated verbally that the 7-Eleven transaction would be a 50/50 split between Nick and Matt Herman; and
- it had been communicated verbally that Nick would shadow Matt as a learning experience "in every facet of the deal."

50. The same HR notes describe Nick's participation in the transaction and state that, before February 6, neither Matt nor Graciela had communicated dissatisfaction with Nick's participation, activity level, MAP work, MEDDPICC work, or performance on the opportunity.

51. The hostile work environment by CloudBees (in an attempted to keep its ill-gotten gains from Shafer's labor and/or successful sales) were displayed by the following (but not limited to) events in an effort to get Shafer to resign:

(i) Gross managerial incompetence on multiple fronts (consistently confused about processes and compensation, conducted no performance reviews, purposely kept accounts (and pipeline) out of Shafer's sales territory, claimed to have no idea how Shafer was running his business after 7 months while simultaneously claiming poor performance, etc.);

(ii) Use of threatening language by a superior directed at a subordinate;

(iii) Theft/Conversion of sales deals in direct breach of contract;
(iv) Ostracized at company meeting by both manager and onboarding mentor;

(v) Fabricated poor performance with zero supporting documentation;

(vi) Weaponized PIP letter with a laundry list of milestones to be achieved in a completely unachievable time frame; and;

(vii) Expectation to present an inaccurate representation of Shafer's performance at Quarterly Business Review ("QBR") (meeting of many people on a zoom call) by both CloudBees management and Human Resources. Shafer had already achieved 4th quarter ("Q4") sales at 95 percent of his sales quota and with the 1st quarter 2024 Dell deal, he would have sold 117 percent of his sales quota. By thereafter, stripping him of his already closed sales, CloudBees planned to publicly humiliate Shafer at the QBR by making him announce and/or agree that he had only achieved 20 percent in Q4 and nothing at all in Q1, 2024.

52. Due to this hostile work environment, Shafer was forced to take his first "mental health day" of his career (over 20 plus years), in order to avoid the March QBR public belittlement and/or shaming by CloudBees.

53. Moreover, these purposeful acts and/or omissions by CloudBees also caused Shafer to experience the first panic attack of his life, and he had to go to the ER for treatment.

54. Shafer also turned to the Better Help counseling included in the benefits package to help deal with the stress of this situation.

55. Within 10 days of the planned deprecation planned for Shafer at the CloudBees QBR, Shafer was wrongfully terminated.

## D. CAUSES OF ACTION

### COUNT I: BREACH OF CONTRACT

56. Plaintiff Schafer repleads and incorporates by reference Paragraphs 1–55, above, as if fully set forth herein.

A. Existence of Valid Contracts

57. Plaintiff Schafer and Defendant CloudBees entered into valid and enforceable written agreements governing Schafer's compensation, including (i) CloudBees' July 25, 2023 Offer Letter and (ii) the CloudBees FY24 Sales Incentive Compensation Policy and related Compensation Plan (collectively, the "Agreements").

58. The Agreements set forth the terms under which Schafer was entitled to receive base salary, non-recoverable draw payments, and incentive compensation, including commissions earned on qualifying sales transactions.

B. Schafer's Performance

59. Schafer performed his obligations under the Agreements by accepting CloudBees' offer of employment, performing his duties as an Account Executive, pursuing and closing sales opportunities, and otherwise complying with the requirements of the applicable compensation policies.

C. CloudBees' Breaches

i. Failure to Pay Earned Incentive Compensation

60. The Agreements require CloudBees to pay incentive compensation that is earned and unpaid, including upon termination of employment for any reason.

61. During his employment, Schafer successfully closed multiple qualifying sales transactions that satisfied the contractual requirements for earning incentive

compensation under the FY24 Sales Incentive Compensation Policy, including satisfaction of the booking and performance criteria set forth therein.

62. Despite Schafer's performance and the earning of such incentive compensation, CloudBees failed and refused to pay Schafer commissions and other incentive compensation that were earned and owed under the Agreements.

ii. Breach of Non-Recoverable Draw Obligations

63. The Offer Letter expressly provided that Schafer would receive a non-recoverable draw against commissions during the initial period of his employment, and that such draw was not subject to repayment or clawback if commissions ultimately fell short.

64. Contrary to these express contractual terms, CloudBees improperly offset, withheld, or otherwise deprived Schafer of the full benefit of the non-recoverable draw promised in the Offer Letter.

65. Failure to Comply with Termination-Related Payment Obligations

66. The FY24 Sales Incentive Compensation Policy further provides that, upon termination of employment for any reason, CloudBees must pay all incentive compensation that was earned and unpaid as of the termination date.

67. Schafer's employment with CloudBees ended in February 2024 after CloudBees implemented changes to Schafer's compensation structure and sales assignments that materially undermined his ability to receive compensation promised under the Agreements and rendered continued employment untenable.

68. Regardless of the circumstances of Schafer's separation, the Agreements required CloudBees to timely pay all earned incentive compensation owed to Schafer as of his termination date.

69. CloudBees breached the Agreements by failing to do so.

D. Damages

As a direct and proximate result of CloudBees' breaches, Schafer has suffered damages including, but not limited to, unpaid commissions, unpaid incentive compensation, unpaid draw amounts, interest, attorneys' fees, and costs as permitted by law

70. All conditions precedent have been performed by Nicholas Schafer and/or the below signed counsel.

71. Due to Defendant's purposeful acts and/or omission, Shafer was required to obtain legal counsel. Plaintiff's offer to settle was tendered to Defendant well over 30 days ago.

72. In accordance with Tex. Civ. Prac. & Rem. Code § 38.001, Plaintiff seeks the usual, customary and reasonable attorney fees expended to pursue Plaintiff's claims. A systematic record of all time expended, the rate applied ($750.00 per hour), and work performed shall be tendered to the trial court Judge for consideration.

**COUNT II:**

**COUNT III: FRAUDULENT INDUCEMENT**

73. Plaintiff Schafer repleads and incorporates by reference Paragraphs 1–55, above, as if fully set forth herein.

74. During the recruiting process, CloudBees made material misrepresentations and misleading partial disclosures regarding the nature of the non-recoverable draw, the effect of the six-month draw structure on commission clawbacks, and Schafer's ability to earn commissions on anticipated onboarding deals.

75. CloudBees made these statements and omissions with the intent that Schafer rely on them in deciding whether to enter into the employment agreement. These

representations and omissions were made for the purpose of inducing Schafer to accept CloudBees' offer of employment and the non-standard compensation structure.

76. Schafer actually and justifiably relied on these statements and omissions by accepting CloudBees' offer of employment and agreeing to the six-month draw structure, which he would not have done had the true operation of the draw and clawback been disclosed.

77. As a direct result of his reliance on CloudBees' misrepresentations and omissions, Schafer suffered financial losses arising from his entry into the employment agreement under the fraudulently induced compensation structure.

78. In summation of this claim:

**Who:** Graciela Arguelles, Sr. Director of Sales and Nick's prospective manager.

**What:** According to Nick, Graciela proposed and recommended the non-standard six-month/50% draw as the arrangement better suited to his territory and expected ramp; compared Nick's situation to her own need for an extended ramp; and discussed a developing 7-Eleven opportunity that Nick would work with onboarding mentor Matt Herman on a 50/50 shared-credit basis.

**When:** July 25, 2023, approximately 4:50–5:20 p.m. Central, during final compensation discussions and the day before Nick executed the written offer.

**Where/How:** One-on-one Google Meet compensation/recruiting discussion.

## E. CONDITIONS PRECEDENT

79. All conditions precedent to Plaintiff's claims for relief have been performed or have occurred. Counsel provided notice to Defendant, including but not limited to, Plaintiff's claim for attorneys fees. Defendant had no intention of settlement. Plaintiff thereafter filed his claim and paid for fees via JAMS, per the contractual terms of his Employment Agreement with Defendant. However, Defendant failed to make payment to JAMS after repeated requests, and finally, JAMS closed out the case for Defendant's

failure to follow its protocol. Thus, having exhausted any administrative remedies prior to the filing of said suit, Shafer filed his Original Petition in a court of jurisdiction in Dallas County, Texas, which was removed to this Court so Shafer now files this Second Amended Complaint.

## F. DAMAGES

80. As a direct and proximate result of Defendant's acts and/or omissions, Shafer has sustained financial losses and incurred expenses.

81. Shafer has also suffered mental damages due to the direct and proximate result of Defendant's acts and/or omissions.

82. Shafer also had to hire the undersigned counsel of record at his usual, customary and reasonable rate of $750.00 hourly.

## G. PRAYER FOR RELIEF AND DEMAND FOR TRIAL BY JURY

WHEREFORE, Plaintiff requests that Defendant appear and answer, and that this case be tried before a jury, after which the Court declare CloudBees liable for damages including but not limited to, the following:

(1) Actual damages;

(2) Mental pain and suffering;

(3) Costs of court;

(4) prejudgment and post-judgment interest at the highest lawful rate;

(5) Reasonable attorneys' fees, and

(6) such other and further relief, at law or in equity, to which Plaintiff is justly entitled.

Dated: October 13, 2026.

Respectfully submitted,

BRUCE C. KAYE, PLLC

/s/ Bruce C. Kaye
Bruce C. Kaye
State Bar No. 00784374
Heritage One
4835 LBJ Expressway, Suite 470
Dallas, Texas 75201
Phone: (214) 722-7438
Email: bruce@brucekaye.com

ATTORNEY FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

I hereby certify that on October 13, 2026, the foregoing Plaintiff's Third Amended Complaint filed electronically through the Court's CM/ECF system, which will serve notice of such filing on all counsel of record.

/s/ Bruce C. Kaye
Bruce C. Kaye