# EXHIBIT "F"

# Notes for HR Retaliation Investigation:

Nick Schafer is experiencing multiple forms of retaliation by his manager, Graciela Arguelles, stemming from questions he asked to the CloudBees compensation committee on 2/1/24.

## PIP LETTER:

- Per the Employee Handbook, I'm coming directly to the HR team to report retaliation so that an investigation can begin.
- I am **NOT** resigning my position. However, given the severity of this situation, I will undoubtedly need considerable help and support from HR to get through this awful and unfortunate situation.
- I'm shocked to find myself having to report retaliation, but this PIP letter came out of left field and several things Graciela has written do not line up with what I've experienced, her verbal communication, or the documentation I've gathered.
- From 8/7/23 through 2/6/24, there was no communication (or written documentation) from Graciela focused on subpar performance, or how I was not meeting her expectations of me. At no point before 2/26/24 did Graciela communicate (or document in writing) any displeasure with my learning of CloudBees processes.
- In fact, until 2/6/24, I received zero negative feedback from Graciela, my onboarding mentor Matt Herman, or anyone else. To the contrary, the feedback I've gotten in my time here has been overwhelmingly positive. And, I'm confident that the feedback from my customers will also be positive when you reach out to them about me.
- The PIP letter written by Graciela does not read like a performance improvement plan at all. Instead, it contains multiple bullet points that, when combined with each other and put on an unrealistic 30-day timeline, guarantees I will fail.

## COMPENSATION EXCEPTION & DRAW:

- Given the timing, I contend this PIP letter stems from reasonable questions I asked to the compensation committee on 2/1/24. I forwarded that email to Graciela the same day. She is now retaliating against me by (1) inventing poor performance, (2) taking away accounts, and (3) reclassifying successfully closed deals so that I do not get credit.
- After I asked questions to the compensation committee, my relationship with Graciela changed drastically. We went from everything being fine to Graciela suddenly becoming hostile and retaliatory.
- During my interview process, I planned to accept the standard 3-month sales draw until Graciela suggested a 6-month draw. She shared about her own hiring process and drew a direct comparison to her situation building a team and my situation building a troubled sales territory. I chose the 6-month option <u>because</u> she suggested it (after all, no one was in a better position than her to know what accounts and pipeline would be assigned to me since she was the one assigning them). And, I wouldn't have even known about a non-standard 6-month option had she not brought it up.

- During our 2/6/24 1:1 meeting, Graciela said "nobody held a gun to your head to choose that option". This is threatening language no manager should use with an employee.

## 7-ELEVEN DEAL:

- It was communicated verbally that this deal would be a 50/50 split between me and my onboarding mentor, Matt Herman.
- It was communicated verbally that I would shadow Matt on this deal as a learning experience in every facet of the deal. Matt insisted on being the face of CloudBees to the 7-Eleven teams to minimize confusion. As the Senior Rep, he also insisted on leading our internal legal efforts with Kaleo as well as the outreach to our CloudBees executives.
- For a good portion of the deal, Matt and I were in pretty good sync with each other. But, as the deal progressed, rather than act in a mentorship role, Matt began to pull away more and exclude me from learning opportunities and ways to engage in the deal. The reasons given for this were (1) expediency and (2) a lack of time late in the fiscal year. In an effort to be a good team player, I gave Matt the space he needed and allowed him to catch me up when he had the time. At no point was I unavailable to meet with Matt or attend a call. At no point did Matt assign work to me that I did not do. At no point did Matt ask me for help or assistance that I did not give.
- Graciela's comments about MAPs and MEDDPICC are misrepresentations. I regularly collaborated on these items with Matt. At no point before 2/6/24 did Graciela or Matt communicate (or document in writing) any displeasure about the existence of incomplete MAPs or MEDDPICC on this deal. At no point before 2/6/24 did Graciela or Matt communicate (or document in writing) any displeasure about my participation in creating MAPs or MEDDPICC on this deal.
- Regarding the expectations Graciela says she had, at no point before 2/6/24 did Graciela or Matt communicate (or document in writing) that I was not meeting expectations. At no point before 2/6/24 did Graciela or Matt communicate (or document in writing) that my activity levels were inappropriate.
- At no point before 2/6/24 did Graciela communicate (or document in writing) any expectations to be achieved by November 2023. I have found no written evidence in email/Slack that indicates anything negative about my performance on MAPs, MEDDPICC, or MSAs.
- As part of the hostile environment I've experienced throughout February 2024, I have not received a call, email, or Slack message from Matt since 2/2/24. On 2/6/24, Graciela was openly hostile, and called my integrity into question when she accused me of rooting against the 7-Eleven deal closing in January. Both Matt and Graciela actively avoided me during this year's Sales Kick Off in Las Vegas.
- It is unconscionable that CloudBees would wait for a deal to successfully close, money to change hands, and then retroactively remove an Account Executive from a deal.

## DELL DEAL(S):

- As part of the ongoing retaliation, Graciela is taking credit away from me on the Dell deal that closed in February 2024. She is also attempting to invent a false narrative that I was not trying to deliver quickly (or appropriately) for the customer.
- In reality, Graciela's involvement in the February Dell deal shows that she (1) slowed it down at multiple times, and (2) conveyed incorrect information to me that I wouldn't get paid for this deal if the deal term was less than one year. The CloudBees Sales Ops team had to correct her misstatements to me.
- Graciela also demonstrated seriously questionable judgement when she instructed me to deliver a non-binding, unfinalized quote with a yet-to-be-determined credit to Dell (on a thread with a wide-ranging group that included Dell's tool users, procurement, and leadership). This quote was rejected by Dell, and it reflected poorly on CloudBees.
- It is unconscionable that CloudBees would wait for a deal to successfully close, for money to change hands, for Graciela and Taylor Seus to tell me I would retire quota and earn commission, and then retroactively classify a deal to revoke the credit.

## MANAGERIAL DISENGAGEMENT:

- The first 1:1 meeting with Graciela where she kept a notes document occurred on 2/21/24. I contend that Graciela created no other 1:1 meeting transcripts because there were no performance issues to document.
- In the 2/21/24 1:1 meeting, Graciela claimed (bizarrely in my estimation) to have noticed my sales territory spreadsheets for the first time. In her documentation of that meeting, she wrote: "Nick presented the work he has done organizing his accounts. First time Nick presented the work done on organizing the accounts, the information he got on contacts, etc. Organized by customer, prospects Tier 1 and rest."
- In actuality, the spreadsheets she was referencing were created dating back to August 2023. I pull this workbook up at the beginning of each day, and it is open for every internal meeting I have. Interviews with those I work regularly with (Matt Herman, Chris Wroble, Reece Belmondo, CSMs, etc.) will reveal that they have all seen my spreadsheets on multiple occasions. Not only that, but Graciela and I frequently share screens during our 1:1 meetings, and she has seen them on many, many occasions.
- Not only that, but I gave Graciela shared access to this Excel workbook early in my tenure (I cannot figure out a way within Google Sheets to find the exact date access was shared with her). If I hadn't shared them with her by the end of August, my best recollection is that they were shared in September 2023. This timing makes sense because Graciela requested that I research the strategic accounts with HQs based in TOLA in preparation for account reshuffling at the end of the fiscal year. I created a tab specifically for her use and labeled it as new accounts to add to the strategic TOLA region. All of the spreadsheet tabs Graciela claimed to have seen for the first time (Key Customers, Key Prospects, Customer Heat Map, Renewals, Account List, Top 40 targets, etc.) precede the "accounts to add" spreadsheet I created for her use.
- If you refer to our Slack conversation on 11/8/2023 (Graciela's birthday), she requested I put the link to the "accounts to add" spreadsheet in our Slack chat. My recollection is

that she told me when we met that day that she could not find the original email notification that these spreadsheets had been shared with her.

- If my job performance was poor in multiple respects over a period of several months, why did Graciela write that she had never seen my organizational spreadsheets until 2/21/24? Wouldn't an engaged (and concerned) manager have asked before month 7 that I show her how I'm running my business?
- In late January 2024 / early February 2024, Graciela and I had a major miscommunication regarding her process for reassigning accounts for FY25. She did communicate to the team that she had started working on this big task, but she was not transparent about her process. She closed this incredibly important process (and refused to allow any more changes) without giving every AE a heads-up that she was finalizing her process. I now know why several of the accounts I requested (dating back months!) ended up not getting assigned to me. All of the research and work Graciela requested of me went completely ignored and/or forgotten. This has had a direct detrimental effect on me and my business—for example, I requested the JC Penney account months ago and documented it in the spreadsheet I created for her. She ignored that request (even though JC Penney's substantial revenues automatically qualify it as a strategic-level account) and gave the account to a different AE. There is now a real, substantial deal (valued at roughly $360k) with the potential to close in Q1 FY2025. I brought this oversight to her attention on 2/9/24, but we had already entered the retaliation phase of our relationship, and my request was unsurprisingly denied.

## QBR:

- I met with Graciela on 2/29/24 to discuss the sales territory numbers she expects to see in the FY25 Q1 QBR scheduled for 3/5/24. In that meeting, she remained fully committed to taking credit away for my successful deals and taking away accounts.
- Because of this, I cannot present during the QBR meeting and publicly lend credibility to a grossly inaccurate representation of my performance. I would have willingly presented accurate information that includes the won deals with 7-Eleven and Dell, as well as the potential deal with JC Penney that should have been assigned to the TOLA strategic AE, but that path is not an option.

## HR:

- Given the serious nature of this personal attack, I do not feel it is my best interests to have further direct communication and contact with Graciela. One way HR can support me is to offer direction on what duties I should focus on during the retaliation investigation.
- If your investigation finds there is no validity to my claims of retaliation and a hostile work environment, I reserve my right to request arbitration. I expect I will remain an employee in good standing through the course of the HR investigation, and through arbitration (if it is necessary).